25-4101. You may proceed. Good morning, Your Honor. May it please the Court, I am Chris Renner for the appellant, Homie Technology. I will aim to reserve about a minute of my time if that will be possible. The primary issue on appeal is the correct application of the concerted action element of Section 1 of the Sherman Act. The appellees used their control of the nation's multiple listing services to promulgate rules that facilitated exclusionary conduct, called steering, at the expense of brokerages offering low prices to consumers. Consumers were harmed by the steering, which contributed to stubbornly high and elevated commission levels. The appellant was also injured by the steering as well, and suffered injury at the hands of NAR's members in Utah in the course of providing low-priced brokerage services. Now on appeal, the appellees repeat the error of the district court and take the position that the Utah members of NAR that caused Homie's injuries were third parties to the conspiracy. This argument is foreclosed by an unbroken chain of Supreme Court precedent that stretches back over a century. It's black-letter law that when an association controlled by competitors promulgates rules that govern the marketplace conduct of its members, those rules are the concerted action of the members. It's been clear since at least 1946 in the Associated Press case that the members of the conspiracy include all members of the association. So your position is, is you don't have to have, all you have to have to drag the members into it is the rules, not that they actually took any action pursuant to the rules? No, that's actually not our position, Your Honor. Thank you. We brought this action against the association itself, which can be sued under Section 1 as a contract combination or conspiracy of its members. We sued the association and we sued a number of large brokerages that sit on the board of NAR, staff, subsidiary committees at NAR were involved in the promulgation and enforcement of the rules and instructed their members in Utah to join NAR and adhere to its rules. So we're not saying that all we need to drag an NAR member into court is the NAR rule. That's not this case. Now, let's take it as an example, because NAR has raised this. Let's take it as an example, remote and unknowing co-conspirator. A member of NAR, let's say in Florida, who joins NAR to broker one home sale a year. That defendant would have a number of meritorious defenses to an antitrust claim, including Article 3 traceability, proximate cause, personal jurisdiction. There are a number of defenses that that remote and unknowing association member defendant could raise. But the important part is that's not this case and that issue is not before the court. So back to the application of the Section 1, this court has actually and unsurprisingly followed this unbroken line of Supreme Court precedent. So in the Board of Regents case, which involved a rule of the NCAA, this court treated the relevant NCAA rule as an agreement among the 600 member institutions of the NCAA. So we think it's black letter law that the rules of an association that govern the marketplace conduct of the members are the concerted action of the members. And it's too late in the day to re-argue that point. Once that point's established, the rest of the issues in the case become easy. So on the continuing violation issue, the district court and the appellees urge that the Utah tortfeasors, the Utah NAR members that caused Homie's injuries, were third parties to the conspiracy. But they're not. They're card carrying members of the conspiracy affected by the rules, making this case a continuing violation of the Sherman Act, of an agreement formed outside the limitations period and enforced within the limitations period by conspirators inflicting new and accumulating injury on the plaintiff, makes this case indistinguishable from Champaign Meadows and Hennigan. But you have to go far beyond that. What you're claiming here is that the rules themselves, you have to be saying the rules are themselves a group boycott, aren't you? No, no, we don't actually have to say that. How do you get around that? I don't understand how you get around that. Is it, take the first rule. I mean, it's basically a disclosure of what charges are going to be made by the seller's broker and the buyer's broker. What is there about that that causes a, that is a group boycott? We're not contending that that rule in itself is a group boycott and that issue is not before the court. Aren't you saying all the rules together make this a group boycott? We're saying the cumulative effect of the rules is to create a market structure that facilitates exclusionary conduct at the expense of brokerages offering low prices. You know, that sounds like to me, a section two type claim rather than a section one type claim, because you have to show a combination contract or conspiracy. We have. To boycott. We need to show a contract combination or conspiracy to do something. What the effect of that contract combination or conspiracy is, is a question governed by the unreasonable restraint of trade element. Hypothetically, if a group has a rule that proposes completely innocent conduct and members use that conduct to boycott a competitor, then the group that promulgated the rule are guilty under section one. Isn't that what you're saying? Not in every case, and that's not this case. So I think the question you're raising is, are the boycotts engaged in by the association members the reasonably foreseeable consequences of the concerted action to which they agreed by joining the association? In this case, we've alleged going through each rule, specific factual allegations that explain how that specific rule increase the likelihood and profitability of steering. The cumulative effect of those allegations, well pleaded and entitled to the presumption of truth, manifest a institutional commitment on the part of NAR to facilitate steering by its members. That's what we're alleging. Facilitation, though, is different than exclusion. Your injury here is caused by individual brokers choosing not to steer their clients to homey houses. It's not caused by the rule. The rule is informational. The injury, the injury to competition, is the boycott. Whether it's individual or everybody's in on it, but that's what injures your clients. A couple thoughts on that. First, not all the rules are simply informational. The buyer-broker compensation rule that we've been discussing, I think I agree. That's plausibly... Isn't that the pinnacle rule? That's the important rule. I'm not sure that's true. So it lays the foundation for everything that follows. All right, well you can get back to that. You need to answer Judge Tibbetts' question. I will, sir. Thank you. So not all the rules are informational. Look at the commission filter rules and practices. The commission filter rules and practices explicitly, this is a mandatory NAR rule that requires the MLSs to allow their members to filter out homes offering a low cooperative commission from the search results shown to consumers. Take a look at paragraph 76 of the complaint. That's exactly how this was used in Utah. There were competing real estate brokers that communicated with one another about using the commission filter rules and practice to filter out homies' homes from the search results that were shown to consumers. And we have allegations, well pleaded, entitled to the presumption of truth, that the Utah NAR members communicated with one another about that use of the rule. That's not informational. Okay, let me, that sounds like they're just trying to figure out what is the commission rate that will be acceptable to homie for the buying agent. Isn't that what that rule does? No, no, respectfully not, Your Honor. I don't understand how the rule was, how you claim it was operated, how it was used. So again, we discussed this in paragraph 76 and I think the preceding paragraph, but let's just take an example. I'm the real estate agent, you, Your Honor, are my client. And I'm the buyer or seller? You are the buyer, okay. So I, the real estate agent, search the MLS. I run a search for all the properties that have a low buyer-broker commission. I filter all, I filter all those out of the search results because I don't want to show you that home because I'm not going to make as much money as I want. Then I show you the search results. All of the low buyer-broker commission properties are filtered out. But it goes, it's worse than that, Your Honor. How is that a conspiracy? That is just one person operating at their, in their financial interest. I, as a, as a agent for the buyer, don't want to show that buyer homes where I'm going to get a lower rate or no rate and, but that's, that's not a conspiracy against homey. You're missing two conspiracies, Your Honor. First, the NAR rule that allows the MLS participants to engage in this filtering is concerted action under the Sherman Act. You're missing that conspiracy. But, but, well, you're missing my part. I don't see how filtering is a problem. That's, that's in their financial interest. That's, I can, I can make money, I can make money if I filter. If I don't filter, I'm, I'm going to be representing a seller and I may get no commission. All conspiracy members make money by engaging in restraints of trade. That's not enough to distinguish an antitrust violation from unilateral conduct. But, Your Honor, just so we're tracking, there's a second, there's a second. The filtering has to be a conspiracy to filter, doesn't it? The conspiracy to filter is embodied in the rules. We have it by direct evidence. Yes. How does, how does, does the rule say all of you folks must filter? I don't understand where you get that. No, no. It doesn't say all of you folks may filter. It leaves discretion. But, an association rule that leaves discretion to the association members to engage in any competitive conduct can still be actionable. Look at Associated Press. Look at page 10 and 11 of Associated Press. In Associated Press, the association had a rule that can, that allowed each member of the association to exercise a veto over the accession of a new competitor to the association. The exercise of the veto was optional, and it was still struck down by the Supreme Court. So, the fact that there's no mandatory steering required by the rules does not mean that this is not concerted action, and it doesn't mean that it's not any competitive. But, I just want to come back, Your Honor, because there was a second conspiracy you were missing. Paragraph 76 alleges that the NAR members in Utah not only unilaterally filtered the search results pursuant to the NAR rule that allowed them to do that, it also alleges that they communicated with their competitors, saying, see here, look, I've filtered out Homie's homes. You should do it, too. I will teach you how to use the filter to do this. So, you're missing two conspiracies there. Well, that's sharing information, which on its face is okay. I mean, it's like- Agreements to- I'm teaching you how to figure out what the rule, to get information that is a result of the rule that you're supposed to publish what the seller's agent gets and what the buyer's agent gets. Agreements to exchange information are nevertheless concerted action under Section 1, and they can violate Section 1 when they have unreasonable effects on competition. Well, then you're drifting into the rule of reason stuff. No, I'm pointing out that agreements to exchange information can be actionable. Well, the exchange of information is not a combat contract in violation of Section 1. You can exchange the information. If you're exchanging information and you agree this will be the price, that's a price fix. Your Honor, with respect, that's false. An agreement to exchange information is concerted action under Section 1 and can violate the Sherman Act. I can see that I've used up all my time. I'll give you some rebuttal. Thank you, sir. Mr. Michael, go ahead first.  Thank you, Your Honor, and may it please the Court. Chris Michel representing the National Association of Realtors. I'll lead off with several grounds that support affirming for all of the defendants that my colleague, Mr. Van Ort, will add some further points, including with respect to the brokerage defendants. As the district court correctly recognized, Homey's claim fails from first principles. The core element of a Section 1 Sherman Act claim is an agreement, not just any agreement, but an agreement to engage in anti-competitive conduct. The anti-competitive conduct that Homey alleges here is a boycott of its business in Utah. But the fundamental problem with Homey's claim is that it is not plausibly alleged that the defendants it sued agreed to engage in that conduct. Homey principally points to the National Realtors Association rules, but as Judge Murphy pointed out, those rules govern discrete aspects of operating the MLS, that's the multiple listing service. They don't say anything about how realtors deal with each other, and they certainly don't say anything approximating that realtors can boycott or refuse to deal with others. Those rules are thus categorically different than the kind of rules that my friend pointed to when providing direct evidence of a boycott, a group boycott, or a concerted refusal to deal. The rules also have plainly valid justifications that my friend fails to exclude. For example, they help facilitate transactions between buyers and sellers by matching willing buyers with willing sellers. And in fact, the absence of the effect that Homey is pointing to is particularly clear in this case, as the district court observed, because the rules were in place for years while Homey was thriving as a brokerage. So its reliance on them is both implausible and time-barred under the statute of limitations. Their theory is that the rules facilitate this group boycott, because otherwise, without the rule, individual brokers really wouldn't have access to information in an efficient way. So by adopting this rule, the brokers have built in a mechanism, the association's built in a mechanism to assist that class of brokers that want to avoid low-buyer-broker commissions. And the effect on that is it harms Homey's business. Why isn't that at least enough at the Rule 12 stage to get over that? Right. So several responses, Your Honor. First, I think the notion of the rules facilitating a group boycott is a concession that the rules don't actually require or provide for a group boycott. So we're out of the world of direct evidence. We're out of the world of cases like NCAA versus Regents, where the NCAA rule expressly excluded certain broadcast networks. We're in the world of circumstantial evidence. And it's the Associated Press. Associated Press, again, was a rule that allowed exclusion of new members. I take it my friend argues there was a veto, but that's an exclusion rule. This is, if you look at these rules, and they are a bit complicated. They're at pages 7 through 9 of our brief. But it's not complicated to read those rules and recognize that they don't say a thing about boycotts or exclusion. And when you contrast those to cases in which courts have found group boycotts, it's striking. So we're in the world of circumstantial evidence. And as the Supreme Court said in Twombly, and as this Court said in the, I believe it's pronounced, Wakua case, in that circumstance, the plaintiff, even at the 12B6 stage, has to exclude the possibility of independent economic motivation as opposed to agreement to explain the conduct. And here, there's a perfectly natural independent explanation for the broker's conduct. And that's that they want to transact with brokers who offer them higher commissions. That is a much more straightforward explanation than any kind of agreement at the national realtor level translating down to the brokers in Utah. At this point, at the 12B6 level, isn't it appropriate that you, the district court, allow for either possibility? And that is the possibility that brokers will act at their own self-interest or possibly combine and conspire. No, Your Honor, with respect, I mean, that's the import of the Supreme Court's decision in Twombly and this Court's decision in Wakua, which is that the plaintiff in a, I mean, these cases are directly on point, a Section 1 Sherman Act claim at the pleading stage, the plaintiff must negate the possibility of independent action. And as the Supreme Court explained, that's for a number of different reasons. It's very easy to allege concerted action or parallel conduct in the context of antitrust claims, but it's very clear that's not what the Sherman Act reaches. If the Sherman Act reached all parallel conduct, it would cover all kinds of pro-competitive actions. It's the distinctive agreement to engage in anti-competitive conduct that the Sherman Act reaches. I think on this facilitation point, too, the Ninth Circuit's decision in Supermarket of Holmes, it's a case we cite in our brief, that's particularly helpful in that case. It was conceded by the Realty Board that it provided information that local brokers could use to steer their buyers away from discount brokers, and the Ninth Circuit correctly held in that case that there was no conspiracy by the Realty Board to engage in the boycott. All it did was, at most, create the conditions that the brokers could use. And I think, again, the Wakua case makes that point powerfully. There, the argument was that these associations of rules that can be misused are not contract accommodations or conspiracies. I think that's a good way to put it, and I think that's the way the Wakua case puts it, too. It says in that case there's these rancher associations that filled out these job orders. The allegation in that case was wage fixing, and this Court, in a powerful opinion, explained that the mere fact that the trade association sort of created the framework or created the conditions in which individual members could engage in anti-competitive conduct did not create a plausible inference at the 12B6 stage that the trade association was liable under Section 1. But in that case, there wasn't a rule involved, was there? There was not a rule involved, but I actually think we're in the same context here, because the rules involved, I think my friend more or less has to agree, the rules don't directly require a boycott. So the rules of circumstantial evidence, just like the trade association structure was circumstantial evidence in that case. I think maybe I'll turn the podium over to my colleague, Mr. Menor. Yes. Do we analyze the discussions that we've been having under a standing rubric or under a rubric of just failure to state a claim? I think you can do either, and here's how I would combine that. Would that be consistent with the presentations? Yes. So I think that the district... Either one would be consistent with the presentations. Yes. I think primarily, you know, so the district court held that there was a time bar and that there was no antitrust injury based on the rules themselves. I think most of this appeal has been about Homie trying to loop in the local brokers into the conspiracy, and for that reason, much of the discussion has been about the 12B6 standard on the conspiracy itself. The district court did address that issue, too, but I think all of those are independent grounds to affirm. So to answer your question directly, I think you could say they haven't pled a conspiracy under 12B6 and be done with it. I think you could also affirm on the particular grounds that the district court identified and that Homie has not refuted. Thank you, Your Honor. Thank you. Good afternoon, Your Honors. May it please the Court. I'm Aaron Van Oort. I represent Anywhere Real Estate and I'm arguing also for remax. The defining feature of this case is that Homie chose to sue national entities that did not engage in or agree to the local Utah conduct that it alleges injured it. And we have now seen there are three cases that the parties cite that all involved local discount brokers like Homie that alleged antitrust claims based on a supposed conspiracy to exclude them. It's the Penney case from the 8th Circuit, the Park case from the 5th Circuit, the supermarket case from the 9th Circuit, and everyone follows the same pattern. Every one of them is willing to find liability for the people locally who involved and agreed to and participated, and none of them are willing to find liability for people who weren't involved and didn't participate. And the problem Homie has is because it's trying to state claims against national entities that weren't involved and didn't agree to it is it has to  It has to stretch back in time to NAR rules that were in place two decades ago. It has to stretch on the rules of an agreement and argue that by agreeing to rules that don't themselves agree to a boycott, they're agreeing to something else. Or it has to stretch on causation and say instead of agreeing to something that directly caused their injuries, there's this whole facilitation and indirect. So it has to stretch in one of those ways. The district court threw it out on stretching on time and stretching on causation. You could throw it on and stretching agreement. But the whole problem is it's trying to sue people who didn't participate in or agree to it. Now, you heard counsel for Homie this morning concede that the NAR rules, the trade association rules, do not contain an agreement to steer clients away from Homie or anybody or boycott. He conceded that, and he had to. His complaint, the paragraphs of the complaint, there are nine of them. The only time they ever address who engaged in or agreed to, it's always the local Utah folks. The only thing they allege that the national folks did is agreed to the NAR rules, which do not agree in the boycott. Your Honor, this is analogous to the Yakua case, where there, likewise, the principle is that agreeing just to join a trade association does not mean you agree to everything those members do. That's Homie's argument, is that if you agree to join the National Association of Realtors and agree to these rules that just disclose price, you're agreeing to everything everybody does. So my client in New Jersey, minding its own business, wakes up one morning and says, wait, we're responsible for what that happened in Utah? We didn't agree to that. But was REMAX on the NAR board that ratified and re-upped these rules each year? Yeah, it's not that there is an allegation that anywhere in REMAX we're engaged in the rules. But the problem is, Your Honor, they've conceded the rules don't agree to the boycott. So they need an agreement to the boycott. And that's the problem. It's like nobody, by joining NAR, agreed to steer clients away from Homie or boycott. They've conceded that. They don't plead it. So then they're left with the causation argument, Your Honor, which is that, okay, you agreed to something else that facilitated it. And the Supreme Court is now clear in Associated General Contractors, the rule is proximate causation, not indirect. This court's decision in Sharpe says it has to be a direct result of what you agreed to, not an indirect. And, Your Honor, you thought of a phrase I hadn't thought and wasn't in the briefs. Agreeing to rules that can be misused, that's not a conspiracy itself and it's not causation of it either. In all of the cases counsel for Homie cites where there is liability directly for the rules, it's because the rules themselves agreed to the exclusionary conduct. It's either directly exclusionary, like we will not allow you to join. We'll nix you out. That's the rule, right? That's obviously agreement and it's direct. And the other ones, the old case, they go back to the wages of C workers. There was an agreement to eliminate competition and set the wages. Of course, the rules directly did it. Here, all the rules did, the main one, is disclose price. But of course, Homie needs to disclose the price. It was competing on price. They have literally no case, no case, where just disclosing price to the people who would engage in the transaction has ever been found to be sufficient of a conspiracy. And the supermarket case in the Ninth Circuit that we've cited directly draws that distinction and it says, no, that's not enough. That's not enough. So, just to go back, there's a consistent pattern here when it's discount brokerages in real estate. You can state claims against the local folks who agree, but not against other folks who didn't agree and didn't participate. And that's what they're trying to get past here and that's the fundamental problem. Your Honor, if you have a question, I want you to be able to ask it. I just have a big question mark. That's my face. Oh, OK. Well, if Your Honors don't have any other, oh, go ahead. Do you think the primary flaw here is a lack of a plausible allegation of antitrust injury or is it implausibly alleged causation? Yeah, it's a disconnect problem. It's an antitrust stand. Yeah, it's not like an Article III standing to sue. It's not a lack of injury. The fact is that the injury they allege that would be an antitrust injury is an injury caused by local folks if there was an agreement among those folks not to do business with them or to steer. So, Your Honor, unilateral conduct, unilaterally just refusing to deal because I don't like your prices, that's not an antitrust injury. There has to be an agreement. So, if there were an agreement among these local Utah folks, hold on, I'm finishing. Please continue. If there were an agreement among the local Utah folks to steer business away, to be an agreement, a conspiracy by competitors to all do that, and as a result, HOME is driven out of business, that's an antitrust injury. But the problem with these defendants, they can't peg that injury to these defendants, the national ones, because we weren't there, we didn't participate it, and we didn't agree to it. That's why there's a causation problem if you're trying just to tie those local injuries to the NAR rules. If you try to get around it by saying, no, you actually agreed to it, there's an agreement problem because we didn't. So, and if you try to go back, you run out of time. So, like I said, there are different doctrinal ways you can get at it, and the district court did two of them, you could do another. But it all comes down to the fact you're trying to sue people who didn't participate it and didn't agree with it, and so you have to stretch something to try to get that done. And that's clear on the motion. Thank you. Mr. Renner, you can have two minutes. Thank you very much, Your Honor. Counsel cited three cases that the appellees claim go their way, Supermarket of Homes, Park, Penney. I believe counsel for the appellees misstated the holding of Penney. Summary judgment was actually denied in a challenge to the rules of a multiple listing service that allegedly facilitated exclusionary conduct. It just went the other way. Park didn't involve a challenge to an association rule at all, so it's just a different type of case. Supermarket of Homes is a good case for the appellees, but it's factually and procedurally distinguishable. First, it's summary judgment. Second, there's no analog in Supermarket of Homes to the commission filter rules in practice. Supermarket of Homes would be analogous to HOMEe bringing a claim based purely on the buyer-broker compensation rule that I discussed with you earlier, Judge Murphy. But there are other rules here that do, like the commission filter rules in practice, expressly on their face mention steering and, well, they mention excluding the listings based on low cooperative commissions. And the presence of those rules distinguish this case from Supermarket of Homes. Also, one reason summary judgment was granted in Supermarket of Homes was that there was no evidence that the brokers who were part of the MLS were talking to one another about the exclusion of the plaintiff. But there is that here, paragraph 76. Are you saying, then, that of the, what, there are five rules that are focused on, that the first on the disclosure of information on listings is really not important to your claim? No, it lays the foundation for the steering. By requiring the disclosure of the low buyer-broker commission in the MLS, it sets the factual predicate for the steering that's then affected through the commission filter rules and practices, among the other rules. If that were the only rule, the broker compensation rule, if that was the only thing we had in this case, would you lose? Probably. In other words, you need the other rules. Yeah, I think so. I think so. The other rules are, would you characterize those as enforcement rules? They're rules that amplify whatever exclusionary effect is in the buyer-broker compensation rule. They're rules that manifest the institutional commitment to the encouragement of steering. If I could just have 15 seconds. The counsel for both appellees articulated a rule that, respectfully, is contrary to the Sherman Act. So you heard twice, I'm quoting, rules that can be misused cannot be contracts, combinations, or conspiracies. As an officer of the court, please don't hold that. The element of concerted action under the Sherman Act is antecedent to and distinct from the unreasonable restraint of trade element. That's American needle. So rules that can be misused are concerted action within the meaning of section one. You might think that we've- But the misuse has to be pursuant to a conspiracy. The rule is the conspiracy. I thought the rule was just the facility. And that you have this rule, and it can, and you can misuse it. But you have to misuse it in conspiring with somebody else to do it. The rule is the conspiracy. The Supreme Court has so held 16 times. I appreciate the court's indulgence. All right, yeah. Time's expired. I appreciate the arguments this morning very much. The counsel are excused and the case is submitted.